UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NDC Boston Builders LLC,<br><br>     Plaintiff,<br><br>  - v. —<br><br>CMB Carpentry LLC and<br>Christopher Bedry,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

### **Introduction**

1.  The Plaintiff, NDC Boston Builders LLC ("NDC") brings this action against the Defendants CMB Carpentry LLC, and Christopher Bedry, ("Bedry", collectively the "Defendants"), for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of M.G.L. c. 93A, unjust enrichment, quantum meruit, and declaratory relief arising from Bedry's breach of a 2023 Agreement with NDC for the construction of the cabinetry portions of two kitchens (the "Cabinetry"), both located in an NDC construction project at 57 Chatham Street, Brookline, Massachusetts (the "Project"). Defendants breached this contract and violated Massachusetts law when (i) in order to induce NDC to contract and to pay them more than $218,000.00 prior to installation, the Defendants made false representations that the they would timely construct, finish and install the Cabinetry, and work with the Project owners to adjust that construction as necessary, (ii) insisted on an advance deposit in the amount of $10,000.00 against the total contract price and thereafter falsely recharacterized that payment as a reservation of time and refused to apply that credit to the total contract price, (iii) after

receiving payment of more than $218,000.00, without notice or justification refused to continue

work on the Cabinetry unless NDC agreed to change the terms of the Agreement to make those

terms more favorable and unless NDC agreed to increase the total contract price, (iv) delayed

completion of the Cabinetry altogether unless NDC agreed to what soon turned into an escalating

series of demands for changed terms, additional unbargained for payments and concessions from

NDC, and (iv) through their refusal to honor obligations under the Agreement, compelled NDC

to delay completion of the associated Project phase which in turn delayed substantially the

Project's ultimate completion date multiple times, compelled NDC to remove certain portions of

NDC's work in the relevant portions of the site, damaged NDC's reputation with the Project

owners, and (v) retained the entirety of NDC's $218,000.00 payment without completing,

delivering or installing any of the contracted for Cabinetry.  The Defendants' refusal to honor

their obligations under the Agreement and the refusal to return any of the payments has also

compelled NDC to seek to retain replacement contractors to construct the same Cabinetry, which

will result in NDC having to pay an estimated additional $240,000.00 to obtain the Cabinetry

needed for the Project, and install it as the Defendants had initially agreed to do.

## The Parties

2.     NDC is a Massachusetts corporation with its principal place of business at 10

Hawes Place, Brookline Massachusetts.  It is  a residential builder and renovation general

contractor specializing in high end renovation and construction for luxury residences, the

majority of which are located in Massachusetts.  Michael Minkoff ("Mr. Minkoff") is its

Managing Member.

3.     Christopher Bedry is an individual who resides at 22 Sabre Drive, Selden, New

York.  He is a skilled cabinet fabricator and woodworker.  He maintains a shop facility at 48

Ramsey Road, Unit 18, Shirley, NY.

4.    CMB Carpentry LLC ("CMB") is a New York Corporation with a principal place of business at Bedry's personal address.  Upon information and belief, Bedry is its sole employee, its founder, and its Managing Member.  This entity's business address is identical to Bedry's individual address, 22 Sabre Drive, Selden, New York, and it is in all respects an alter ego of Bedry.  Upon information and belief, this entity sometimes does business as "CMB Woodworking & Cabinetry LLC" and as "CMB Woodworking & Cabinetry Inc."

## Jurisdiction and Venue

5.    This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1332 and 1367, in that the amount in controversy exceeds $75,000.00 and involves citizens of different states.

6.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in Massachusetts, and the Cabinetry at issue was to be delivered and installed in Brookline, Massachusetts.

## Background

### NDC, Mr. Minkoff, Bedry, and the Project

7.    In 2023, Mr. Minkoff was approached by Ellen Golde ("Ms. Golde"), a Massachusetts resident, in connection with what ultimately became the Project.  It was a high-end renovation and construction project for a residence located at 57 Chatham Street in Brookline Massachusetts.  The Project was a complex, multi-million dollar construction project which included, *inter alia*, the design, construction and installation of two high end kitchens at the site, one in the basement (the "Basement Kitchen"), and one on the ground floor, the ("Main Kitchen").  Both Kitchens required unique custom designed cabinetry, which included special installed lighting and specialty finishes with lacquering.

8.      On or about September, 2023, Ms. Golde retained NDC as the general contractor for the Project, and work at the site began shortly thereafter.  NDC was responsible for the ultimate completion of the Project.  The Project scope included demolition, framing, all interior construction and finishing, and landscaping.  The Project scope also included completed construction and installation of both the Main Kitchen and the Basement Kitchen.

9.      Ms. Golde retained a London based architect as the Project designer.  Ms. Golde retained Melinda Kann ("Ms. Kann") to produce all necessary shop of drawings for both kitchens, which included, collectively, the Cabinetry.  Ms. Kann produced separate sets of drawings for the Cabinetry over the course of the Project.  The Cabinetry was sophisticated, custom designed, custom built, and included custom internal and external lighting, doors, drawers, and finishes.  Due to its unique design and special features, the installation of the Cabinetry was a customized procedure, and in order to install it properly, it required installation by the cabinet fabricator.

10.     In late 2023, Mr. Minkoff began discussing with Bedry the Defendants' retention to do the Cabinetry.  Mr. Minkoff had retained the Defendants to construct cabinetry for other projects for many years prior to NDC's retention as the general contract for the Project.  The Defendants were completing another six figure project for NDC in Brookline, Massachusetts at the time. NDC forwarded plans, drawings and specifications, the parties discussed contract terms, and negotiated.  The Defendants and NDC reached agreement (the "Project Agreement"). At the time they did so, the work performed under the Project Agreement and the installation of the fabricated goods were to be complete in less than one year.

11.     NDC and the Defendants had developed an established custom and practice for fabrication, finishing and installation of cabinetry they constructed.  Their custom and practice

was to have Bedry visit the site, review drawings and specs, manufacture the cabinetry at his shop, and install the cabinets at the site.

12.    NDC and the Defendants never used a written contract, and consistent with their custom and practice, they did not use a written contract for the Project either.  Their practice was to negotiate terms and pricing by exchanging relevant plans and design drawings, agreeing on contract terms orally and by exchanging email and text messages, and then performing consistent with that agreement.  These agreements always included installation of the cabinetry by at the project site.  Delays, changes and deviations from original drawings and specifications would be communicated by Mr. Minkoff to Bedry, who would then estimate the impact of the changes on his work, estimate any increased costs and cash flow needs, and he and Mr. Minkoff would agree on both the changes and any additional pricing, usually through a combination of phone calls, texts, and exchanges of emails.  Bedry would periodically provide invoices and other documentation as the work proceeded.  If NDC had questions or issues with charges, Bedry would clarify, and at times the parties would negotiate amounts and payment timing.  NDC would then pay the subject pricing modifications as the parties agreed.  Because the Defendants often charged hourly rates for installation, the final, sometimes adjusted, contract price, and final payment by NDC of the balance of the total contract price, occurred after the Defendants had installed the cabinets at a site.

13.    Typically, agreements between NDC and the Defendants would include NDC forwarding some of the total contract price in advance, to cover fabrication and finishing costs, and the Defendants would then fabricate the cabinets and have finishes applied.  This work would be performed at the Defendants' shop facility on Long Island, New York.  Because installation was always part of these agreements, the Defendants would not complete assembly

of cabinets at their shop, leaving drawers and doors, which were a major part of the fabrication, unassembled, and they would complete assembly at the site.

14.    The total contract price often included a line item for storage charges, in the event installation was delayed and the Defendants had to store the fabricated cabinets at their shop facility.  If delays became longer than reasonably anticipated, the parties would negotiate a storage charge and a start date for any such charges, but this charge never exceeded $80.00 per day, and often any such storage charges did not begin until the cabinets had been stored by the Defendants for months.  NDC was never charged for any storage fees arising from delays caused by the Defendants.

15.    It was common for the scope and/or specifications for projects to change during the construction process, and at times these changes could impact the Defendants' construction of cabinets.  It was not uncommon for dimensions and designs to change, for color to deviate from original plans, and for sizing and lighting adjustments to be required.  NDC and Bedry typically negotiated these changes, with Mr. Minkoff providing information, and both parties negotiating as to any additional costs for labor, materials or other work necessary to accommodate the required changes.

### The Project Agreement

16.    After the Defendants agreed to fabricate and install the Cabinetry, NDC arranged for Bedry to visit the site and take preliminary measurements, which he did twice in the fall of 2023.

17.    The essential and material terms of the Project Agreement which the Defendants and NDC agreed to were memorialized in multiple writings exchanged between the parties, and were as follows: (a) The Defendants would fabricate the Cabinetry for the Project, for both the

Basement Kitchen and the Main Kitchen; (b) the Defendants would be responsible for having the Cabinetry finished by a professional finishing company to the project specifications; (c) the Defendants would install the Cabinetry at the site when the site was ready and when the Cabinetry was fabricated, finished, and ready for installation; (d) the Defendants would work with NDC and the Project designer(s) with respect to any changes in the drawings and specifications, and would provide fabrication details and measurements to NDC when requested; (e) NDC would pay a total contract price of $240,650.00, periodically throughout the contract term, with this price including $4,800.00 for storage charges in anticipation of the possibility that the Cabinetry might remain at the Defendants' shop for awhile after it was complete; (f) once Bedry notified NDC that the Cabinetry was completely fabricated and finished as required, NDC would transport it to the Project site when the kitchens were ready for installation, at NDC's expense within a reasonable time thereafter, and additional storage charges would not apply while the Cabinetry was awaiting pickup during this time.

### *Initial Implementation Of The Project Agreement*

18.    NDC informed Bedry that it would be some time before design, drawings and specifications for the Cabinetry would be final, and that he should not expect those documents immediately.  In May, 2024, the Defendants requested an advance payment against the contract price of $10,000.00 (the "Advance Payment").  NDC paid this to the Defendants on June 3, 2024.

19.    NDC made the following payments under the Project Agreement to the Defendants in 2024, in addition to the Advance Payment: (a) $60,000.00 on June 27, 2024; (b) $68,000.00 on August 6, 2024; and (c) $36,000.00 on November 22, 2024.  In January, 2025, NDC made the

following payments to Bedry: (a) $30,800.00 and $13,500.00 both on January 21, 2025.  By
January 22, 2025, NDC had paid the Defendants a total of $218,300.00.

20.    The balance on the agreed upon contract price on January 22, 2025 was $28,750.00.

21.    As is typical in sophisticated construction projects, Ms. Golde and her designers
and architects made changes to the original Project designs and specifications as the project
progressed.  Some of these changes impacted the work on the Basement and Main Kitchens, and
delayed their configuration and measurements. Bedry caused some of these changes.  For
example, when the design of the cabinet doors was changed to a six inch slot configuration,
Bedry objected on aesthetic grounds, claiming that change would reveal the underlying core of
the wood.  He intentionally delayed producing samples for months, so much so that the Project
designers abandoned the change. The Project Agreement did not include Bedry providing design
input, and his unilateral refusal to produce timely samples because he disagreed with a design
decision was a material breach of the Project Agreement.

22.    Some of these changes impacted the timing of the Defendants' start on the
Cabinetry fabrication, because design changes had to be resolved and finalized before fabrication
could begin.  Bedry was kept advised of these delays.  Bedry was periodically asked to revise his
shop drawings and measurements accordingly.

23.    As Bedry reviewed the changes to the design and drawings, he periodically revised
estimates for the work with the changes included.  He often provided these revised estimates for
the Main Kitchen and Basement Kitchen separately, and not always at the same time.  The
changes in the project design and specifications also impacted on the overall pricing for the
Project.

24. On June 10, 2024, the Defendants provided a pricing adjustment due to design changes, entitled a "revised proposal", for the Main Kitchen. This proposal contained several lines acknowledging that installation was part of the agreement, and reiterating that it was subject to separate pricing.

25. On June 11, 2024, the Defendants provided a pricing estimate for installation of the Cabinetry for the Main Kitchen at the Project site.

26. On July 15, 2024, the Defendants provided a revised pricing proposal for the Basement Kitchen by email to Mr. Minkoff, acknowledging that installation of the Cabinetry at the Project site was an agreed term in the agreement, and reiterating that installation was subject to additional modifications to the total contract price depending on how long it took to install and related costs.

27. Disagreements thereafter arose in connection with pricing revisions for the Cabinetry demanded by the Defendants because many of them added to the total Project cost. Ms. Golde frequently disagreed with Bedry as to what price increases were appropriate under the particular circumstances of a change. Mr. Minkoff and NDC were frequently caught in the middle of these disagreements, as Ms. Golde would ultimately be responsible for any increases to the total Project price caused by the Defendants' revisions. Bedry was often inflexible in connection with these changes and negotiations, and relations between Bedry and NDC began deteriorating.

28. By December 2, 2024, the Project specifications for the Cabinetry, including dimensions and drawings for both kitchens were finalized, and had been provided to Bedry.

29. Upon information and belief, the Defendants began ordering materials for the Cabinetry fabrication some time prior to December 2, 2024, and began fabrication shortly

thereafter.  At some point thereafter, when fabrication was complete, the Defendants sent some of the fabricated Cabinetry to a finishing company and had it finished.  Bedry later confirmed to Mr. Minkoff that the Cabinetry for the Basement Kitchen had not been sent for finishing, and to date remains unfinished.  Bedry informed NDC that the Defendants had completed fabrication of the Basement Kitchen portion of the Cabinetry by January 10, 2025.  NDC made two additional payments under the Project Agreement to him eleven days later.

### *The Defendants Intentionally Breach The Project Agreement*

30.    Prior to January 21, 2025, Bedry began disputing with Ms. Kann the extent to which the Cabinetry complied with certain changes.  Bedry refused to work with her as to certain changes, and took the position that the changes sought was "a complete change … from what was [earlier] approved".  Bedry did not resolve this change issue to Ms. Kann's satisfaction.  Ms. Kann informed Bedry that if he was refusing the subject changes, Ms. Golde would have to consider obtaining the Cabinetry from another vendor.

31.    Following this exchange with Ms. Kann on January 21, 2025, Bedry began his attempt to unilaterally change the contract terms. He sent NDC a statement of outstanding amounts which he claimed NDC owed. The statement claimed that the fabrication of the Cabinetry was complete.  That statement was false.  Bedry later acknowledged that the drawers and doors had not been installed on the cabinets, and that the lighting had not been installed. This "statement" admitted that the Cabinetry had also not been finished as required by the Project Agreement, indicating that the Cabinetry for the Basement Kitchen was completely unfinished.  The statement demanded that Bedry's inflated figure for unpaid outstanding contract price be paid, and that NDC pick up the Cabinetry at his shop only after the unpaid balance was paid in full.  The "statement" required that NDC release the Defendants from any liability under

the Project Agreement prior to picking up the Cabinetry, and demanded that Ms. Golde, who have never been a party to the Project Agreement, release Bedry as well.  The statement required NDC Ms. Golde to accept the Cabinets in "as is" condition.  The "statement" failed to disclose that the Cabinetry lighting had not been installed.

32.    The Defendants' January 21, 2025 statement, with the demands it contained, was a material breach of the Project Agreement.  The Agreement required the Defendants to fabricate and install at the site the completed Cabinetry, which included installation of drawers and doors, completed finishing throughout, and lighting installed.  At the time Bedry demanded payment of the alleged balance due under the Project Agreement, none of that had been done.  In effect, Bedry's demands on January 21, 2025 sought to have NDC pay the balance of the Project Agreement as though the Defendants had fully performed under it, but then pick up partially fabricated, partially finished cabinets, pay a different installer to install them at NDC's expense, and not only release Bedry, but to have Ms. Golde do so as well.  Mr. Minkoff responded by informing Bedry that this was entirely inconsistent with the Project Agreement's terms, informing him that he was breaching the agreement, and demanding that he honor the actual agreed upon terms.

33.    On January 30, 2025, without warning, Bedry also began taking a position with NDC regarding installation of the Cabinetry at the site which was entirely inconsistent with the Project Agreement.  He began insisting that contrary to the explicit terms of the Project Agreement, which he accepted and agreed to in the fall of 2023 and which he had acknowledged on multiple occasions, including in three separate pricing proposals in June and July of 2024, that installation of the Cabinetry at the Project site was not part of the agreement, and he was

only obligated to fabricate the Cabinetry at his shop.  NDC strenuously disputed this contention.

Nonetheless, Bedry refused to install the Cabinetry as agreed.

34.    By February, 2025, NDC and the Defendants were at an impasse.  Bedry was

demanding additional payments to even complete fabrication of the Cabinetry.  He admitted to

Mr. Mr. Minkoff that although he had purchased the cabinet lighting, he had not installed that

either.  NDC reviewed his demands for more money.  Bedry responded by stopping work

entirely and refusing to meaningfully negotiate.

35.    On February 10, 2025, Bedry informed Minkoff that if NDC did not pay the

balance, release him and pick up the incomplete Cabinetry, he would begin charging NDC

storage fees of $150.00 per day, almost double the usual and customary rate, without any of the

customary negotiation.  Nothing in the Project Agreement allowed Bedry to arbitrarily set a

storage fee rate, or a storage fee commencement date.

36.    Bedry also began claiming, for the first time, that the $10,000.00 Advance Payment

against the total contract price was not an advance payment at all, but rather a "reservation on his

[the Defendants'] time".  He took the position that this payment was merely compensation for

him reserving his time to work on the Cabinetry whenever he received a directive to begin, that

this payment was non-refundable and not a credit against the total contract price.  The Project

Agreement never provided for payments to Bedry to "reserve his time", and the Advance

Payment was part of NDC's payment of the total contract price.  Bedry's refusal to credit this

payment against the total contract price was a material breach of the Project Agreement.

37.    By March, 2025, both the Main Kitchen and the Basement Kitchen were ready for

installation of the Cabinetry, with the exception of application of plastering on the associated

walls.  The Project Agreement's revised deadline required Bedry to have the Cabinetry complete

and ready for installation by this time.  The cabinetry was not completely fabricated.  Finish had not been applied to a significant portion of it.  Lighting had not been installed. Bedry's email of January 21, 2025 had implied all work had stopped as of January 10, 2025.  Bedry missed this March, 2025 deadline for completing the Cabinetry and installing it as required under the Project Agreement.  His failure to complete the Cabinetry and install it prior to March 30, 2025 was a material breach of the Project Agreement.  Mr. Minkoff informed Bedry that he was in breach of the agreement.

38.    Bedry's failure to honor his obligations under the Project Agreement brought that portion of the Project to a standstill.  It forced NDC to inform Ms. Golde that this phase of the Project would not be completed on time, due to this baseless dispute with Bedry, and it damaged NDC's reputation with Ms. Golde as a General Contractor who could be trusted to structure construction projects in phases and complete them on time.

39.    Bedry retained counsel and served a demand letter on April 10, 2025 (the "Demand Letter").  That letter demanded that NDC pay a contract balance of $47,200.00 within ten days, disavowed any installation obligation by Bedry, informed NDC that Bedry was now charging storage at the rate of $125.00 per day, and threatened a lawsuit if NDC refused to comply.  NDC's counsel responded on April 21, 2025, denying that NDC owed these amounts and contesting the characterization of Bedry's obligations in the Demand Letter.  The contract balance in this letter far exceeded any amounts owed by NDC under the Project Agreement.

40.    Counsel for NDC and Bedry negotiated  from April, 2024 into August, 2024, but were unable to resolve the dispute.  During that time Bedry informed NDC through counsel that storage charges were being increased to $180.00 per day, and threatened to move the Cabinetry to an offsite storage facility and charge NDC for that as well.

## Count I

### (Breach of Contract)

41.    NDC incorporates by reference and realleges the allegations contained in paragraphs 1 through 40 above, as though specifically set forth herein.

42.    The Project Agreement is a valid and binding contract.

43.    NDC at all times performed its obligations under the Project Agreement.

44.    The Defendants have failed to provide goods and services under this contract consistent with his contract obligations, including but not limited to (a) failing to complete fabrication and finishing of the Cabinetry; (b) failing to properly credit NDC contract payments against the total contract price; (c) demanding unbargained for concessions, payments, and changes of terms under the Agreement; (d) failing to complete finishing of the Cabinetry; (d) failing to deliver the completed and finished Cabinetry to NDC; (e) failing and refusing to install the Cabinetry at the Project site.

45.    The Defendants' failure and refusal to provide goods and services to NDC consistent with his obligation under the Project Agreement customers constitutes a material breach of the Project Agreement.

46.    As a direct and proximate result of the Defendants' breach, NDC has been damaged.

## Count II

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

47.    NDC incorporates by reference and realleges the allegations contained in paragraphs 1 through 46 above, as though specifically set forth herein.

48.    The Project Agreement is a valid and enforceable agreement.

49.    NDC performed its obligations under the Project Agreement.

50.    The Defendants are bound by the implied covenant of

good faith and faith dealing implied in all contracts entered into in Massachusetts.

51.    By and through the conduct described herein, the Defendants have violated that

covenant.

52.    As a direct and proximate result of the Defendants' conduct, NDC has suffered

and continues to suffer damages.

## Count III

### (Unjust Enrichment)

53.    NDC incorporates by reference and realleges the allegations contained in

paragraphs 1 through 52 above, as if specifically set forth herein.

54.    NDC conferred a substantial and measurable benefit upon the Defendants from

2023 through January, 2025, by providing them with $218,000.00 in exchange for the

fabrication, finishing, and installation of the Cabinetry, and by working with them in connection

with the timing of payments, price negotiations, and interfacing with Ms. Golde and the other

professionals doing work on the Project.

55.    The Defendants at all times realized and appreciated the benefit conferred upon

them by NDC's payments and work on their behalf in connection with the Cabinetry and the

Project.

56.    NDC conferred these benefits on the Defendants in reasonable and good faith

reliance upon the Defendants' commitment to fabricating, finishing, and installing the Cabinetry

for an agreed upon price.

57.    As a consequence of the Defendants' refusal to complete the fabrication and finishing of the Cabinetry and his refusal to install it, the Defendants have been unjustly enriched.

58.    It would be unjust for Defendants to retain the financial and benefit of the NDC payments which NDC has provided to them.

## Count IV

### (Violation of M.G.L. c. 93A §§ 2, 11)

59.    NDC incorporates by reference and realleges the allegations contained in paragraphs 1 through 58, as if specifically set forth herein.

60.    NDC and the Defendants are engaged in trade or commerce in the Commonwealth of Massachusetts, within the meaning of M.G.L. c. 93A.

61.    The acts and practices alleged above constitute unfair or deceptive acts and practices in violation of M.G.L. c. 93A, §§ 2, 11.

62.    The Defendants' conduct occurred primarily and substantially within the Commonwealth of Massachusetts.

63.    By deceiving NDC into *inter alia* (a) contracting with NDC to do the Cabinetry work, then (b) demanding the Advance Payment by promising to credit against the total contract price, then (c) demanding payment from NDC of more than half the total contract price before starting work on the Cabinetry, then (d) refusing to continue fabrication work unless NDC made additional payments, then (e) refusing to install the Cabinetry, then (f) demanding NDC pick up the unfinished Cabinetry and pay more than the total contract price to do so, and then (g) release the Defendants and require Ms. Golde to do the same, the Defendants willfully and knowingly violated M.G.L. c. 93A, §§ 2, 11.

64.     As a result of the Defendants' unfair and deceptive acts and practices in violation M.G.L. c. 93A, §§ 2, 11, NDC has and will continue to suffer substantial monetary losses, which were a reasonably foreseeable result of the Defendants' conduct.

### Count V

**(Declaratory Judgment - U.S.C. §§ 2201 et seq.)**

65.     NDC incorporates by reference and realleges the allegations contained in paragraphs 1 through 64 above, as if specifically set forth herein.

66.     Defendants have, among other things: (a) accepted $218,300.00 in payments from NDC; (b) failed and refused to complete fabrication of the Cabinetry; (c) failed and refused to complete the finishing of the Cabinetry; and (d) failed and refused to install the Cabinetry at the Project site, (e) failed and refused to turn over the partially fabricated and partially finished Cabinetry to NDC, (f) demanded payment of amounts in excess of the agreed total contract price, and (g) refused to release the Cabinetry to NDC.

67.     There is an actual controversy between these parties about, among other things, the Defendants' breach of the Project Agreement, the Defendants' obligations under the Project Agreement, and the Defendants' retention of payments made by NDC under the Project Agreement for Cabinetry it never received, and which the Defendants' have refused to install.

68.     In accordance with 28 U.S.C. § 2201 et seq., NDC requests that this Court declare the rights of the parties regarding the issues in controversy.

### Count VI

**(Quantum Meruit)**

69.     NDC incorporates by reference and realleges the allegations contained in paragraphs 1 through 68 above, as though specifically set forth herein.

70.     NDC conferred a measurable benefit upon the Defendants by providing them with payments under the Project Agreement.

71.     The Defendants accepted these payments with the expectation of compensating NDC for them by fabricating, finishing and installing the Cabinetry.

72.     NDC provided the payments and benefits with the reasonable expectation of receiving compensation from the Defendants in the form of their fabrication, finishing an installation of the Cabinetry at the Project site.

73.     The Defendants have failed to compensate NDC for payments by completing  and installing the Cabinetry.

74.     As a result of the Defendants' failure and refusal to compensate NDC for the value of the payments, NDC has been damaged.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, NDC respectfully demands the following relief:

A.     An award of compensatory damages in favor of NDC and against Bedry in the amount of $218,300.00 plus and all damages foreseeably and consequentially resulting from Bedry's breach of the Project Agreement, his breach of the Implied Covenant of Good Faith and Fair Dealing, and his unjust enrichment;

B.     A declaratory judgment and corresponding order that Bedry's failure to honor the terms of the Project Agreement constituted a material breach of the Project Agreement;

C.     Multiple damages and attorney's fees pursuant to M.G.L. 93A §§ 2, 11;

D.     Pre- and post-judgment interest;

E.     Attorneys' fees, costs and expenses, and

F.     Any and all other relief that this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands trial by jury for all claims so triable.

NDC Boston Builders LLC,
By its counsel,

/s/ *Mark S. Resnick*
Mark S. Resnick (BBO #559885)
ResnickLaw LLC
453 Washington Street
Suite 11B
Boston, MA  02111
P: (617) 852-6921
F: (508) 749-6031
*msr@resnicklawllc.law*

Dated: August 11, 2025